Your Honor, the third case on the docket this morning, 2-20-0136, the people of the state of Illinois, Plaintiff Appellee v. Anthony Lamonica, Defendant Appellant. Arguing for the appellant, Mr. Barry Spivak. Arguing for the appellee, Mr. Adam Trejo. Mr. Spivak, you may proceed. If the court please. Good morning, Your Honors and counsel. I'm Barry Spivak, and along with Michael Monaco, I am here on behalf of the Defendant Appellant, Anthony Lamonica. Mr. Lamonica was convicted, who I will refer to as LL. I'll explain a little bit about what this sexual assault case is not. It is not about a man who attacked and forced a woman to have sex with him against her will, or about a man and woman who had not agreed to have sex. Context has some meaning, and in this case, the context is that LL invited Anthony into her apartment with the expectation, indeed the intent, that they would have sex. LL was the one who and she admitted that when she did so, sex was implied. They met at a restaurant. Mr. Spivak, can I ask a question, please? I thought that when they made this date for April of, I guess, 2018, that she said, look, you know, I don't want you coming back to my place. But that somehow changed during the course of the evening? Apparently, yes. She definitely, once in the course of the evening, when they got there, there was a point, the court may recall, that they actually started French kissing and kissing each other while they were at the restaurant. And she admitted that she was the one who invited him to come to her house. And in fact, in the car ride from the restaurant to her apartment, she contacted her friends and said she was coming with this doctor and that they were going, pardon my use of words, they were going to fuck. So regardless of what she might have thought, you know, she had an earlier date with him that didn't go that well, but she thought that everything was over. And at that time, she definitely was clear that she was inviting him over in order to have sex. And that's what happened. As I said, they met at a restaurant. I'm sorry. I was going to ask, during the time when they did have sex, was there ever a time when your client attempted to overpower her? No, there was never a time when he attempted to overpower her. And you can see that from the fact that every time, if she wanted to get out from under him, so to speak, she was able to do it. I think the one that is most obvious is when they did the supposed sex, so-called doggy style sex, where the woman is on her hands and knees and the gentleman, the man is behind her. When she found that it was hurting her, she crawled away from him. He never did anything to restrain her or prevent her from crawling away. And I think she admitted that he never held her down, never prevented her from moving, never forced her so that she couldn't get out from under him. He never did. During the proceedings, the court allowed evidence of another incident with a person by the name of Daigle. It was allowed as an excited utterance. Was it an excited utterance? No, we don't think it was an excited utterance because an excited utterance has to be spontaneous and at the first instance where someone is going to make that utterance. So, we do not believe it was an excited utterance. And you feel then the trial court erred in admitting it, is that correct? Yes, we do feel the trial court erred in admitting it. Were the two incidents, one of the requirements to admit another, we'll call it bad act at this other than Cooper's Hawk seems to be a popular place to go on these plenty of fish dates? Right. No, they were very dissimilar. And in fact, the state's theory was that somehow by bringing in the other acts, they would show that he had a tendency to date a girl, get her inebriated, get her drunk, I guess. And then when defenses were down, sexually assault in fact, if you look at the two different instances with LL, the case on trial, she invited Anthony to come to her apartment for the very purpose of having sex with him. With ES, Anthony invited himself and she told him she did not want to have sex with him. With LL, Anthony and LL made out shamelessly right there in the restaurant at the restaurant table, French kissing all over each other. With ES, Anthony and ES may have exchanged a peck. With LL, she felt Anthony had encouraged her to drink more wine. With ES, she did not feel Anthony had encouraged her to drink more wine. With LL, Anthony started having sex with LL virtually the moment they got to LL's apartment during the period that allegedly she may have been inebriated. With ES, Anthony and ES slept in the same bed all night. And in the entire night, he did not initiate any sexual activity with her and didn't do anything until they were both awake and sober in the morning. With LL, Anthony's sexual manner was apparently so rough that she found it painful. With ES, there was no indication of anything like that. With LL, there was digital penetration. With ES, there was no digital penetration. With LL, after the sexual activity ended, Anthony left so abruptly that the state likened it to flight and rejected LL's request to stay and talk about what had just happened. With ES, it was the complete opposite. Anthony wanted to stand there and he wanted to talk to ES about what happened. And basically, she felt he wouldn't leave. She wanted him to leave. These two instances were completely separate and not at all. I don't think the second act was probative of the first one at all. They were completely, completely different. In this case, the jury had a question. I think the question was whether an alleged victim's perceived threat of force constitutes the threat of force necessary for a conviction of aggravated criminal sexual assault. Didn't the defendant invite error when he rejected the court's suggestion in terms of how to answer this? No. I'm sorry, Judge. Why not? Because what he asked the answer to be was no. That was what counsel said. Counsel said the answer should be no. And that's what he argued for, that the answer should be no, that perception is not enough. No, not in and of itself, right? Well, actually, he first said no. Then someone added, like, not in and of itself. And then as the comic we went on, there was talk about should the judge just, say, read the instructions or should the judge add that additional part, I think 11.65C if I have numbers correctly. But those were fallback positions. What his response, what the defense asked the response should be, would be no. And in fact, that is what the law is. The reason he's convicted, in our view, is not only because the other act's evidence should not have been admitted into evidence, but the fact of the matter is this sort of perception that she had, where she says that she saw a vein pop in Anthony's neck. And she interpreted this vein popping in Anthony's neck as though that was some sort of a threat. The fact of the matter is, he never threatened her. He never said that, he never told her, lie back down. And if you don't have sex with me, I'm going to hit you. She kept talking about how she was fearful of that. But it was her perception when she saw the vein pop in Anthony's neck, you know, something that I assume he can't control, assuming it happened. And that's what, when she saw that, she decided I better lay down and let him have sex with me. That's what happened. But perception is not enough, because it takes away the fact that the defendant has to intend to commit the criminal act. And her perception is not enough to satisfy whether there's a threat of force. The judge, in fact, said there was no threat of force in this particular case. And there wasn't any. So the answer to that question, Judge, we submit was no, which is what the defendant first asked that the answer be. And then as the colloquy went on, they were, what if we do this? What if we do that? But the actual answer and the actual law would be no. You've actually hit on many of the points I was going to make, you know, with respect to the initial time, as I said, they were coming back to, based on her invitation, Anthony and L.L. were heading back to her place to have sex. It turned out that his penetration, whatever he was doing, turned out to, for whatever reason, seemed to be painful to her. That's what she testified to. When she first got home, didn't she take her dogs out? Yes, she did. When she first got home. And when she brought them back, did she put them in cages? Yes, she did put them in cages, which is an interesting point, sort of a side issue, because one of the things she said later about why she didn't leave the apartment after Anthony had gone into the bathroom to ejaculate, even though she said she was so frightened of Anthony, she said, well, she didn't want to leave her dogs, when in fact, she had left her dogs the entire time they were on the date for one thing. And secondly, the dogs were apparently in the cages. So there would have been no reason for her to be fearful of leaving the dogs, she'd left them before. Was there any testimony, either on direct or cross examination, relating to the nature and extent of the dogs' protectiveness or viciousness or aggressiveness to outsiders? No, Your Honor, there was no, I don't believe that came up at all. So whether the dogs were barking madly, or whether the dogs were silent, was not presented as circumstantial evidence? No, Your Honor, there was the testimony with respect to the dogs pretty much ended with the fact that she took the dogs for a walk, brought them back, put them in their cages. And later on, she made the statement about, you know, she didn't leave because she didn't want to leave the dogs. I think that pretty much sums up all the testimony about the dogs. Now, at some point, there were some texts that were at issue during the course of this trial, I believe, texts that L.L. allegedly removed or took off of her phone. Of course, we know that these things can be recovered. But did the jury hear on direct examination about these texts that were erased? No, he wanted to, the defense wanted to bring out the statement about maybe I was wrong, or something to the effect, maybe he didn't rape me. The defense wanted to cross examine, or at least bring that out with L.L. And the judge said it wouldn't allow it under the doctrine of completeness. The judge said that you could, the defense counsel said that he had would testify as to that statement, but then he never called those witnesses. Was he in for not doing that? I believe so. Yes, Your Honor, because I think that was a significant thing that she had said. Maybe I'm paraphrasing something the effect of maybe I was wrong. Or maybe he was right. I think the way she said it. Maybe he didn't rape me something like that. I mean, it shows that she acted as though he was raping her from virtually the moment that he first digitally penetrated her, you know, in her view. And I think, you know, it's a point to keep in mind is this issue of force. There was, I think, a lot of confusion about what force is required in a sexual assault case. So that both in the state's closing argument and the way the witness testified, forcing his fingers or his finger into her vagina was considered forcing someone to have sex with them when that is not the case. That is not the force that is an issue in this particular case. So, you know, there was a lot of talk about that. And there was never any, he never did do everything was consensual. It was in her mind, basically, when, you know, I think at the time when they did the when they're doing this sort of doggy style sex. She says that, and she saw the vein pop in his neck, supposedly. He hadn't said anything. He hadn't threatened her. She thought to testify, she says, in my mind, I thought to myself, oh, my God, if I do not lay down and shut up, he's going to start hitting me. And she thought further in my head, like I went, oh, my God, he is going to start hitting me, or get physical if I don't lay back down. When mind you, Anthony did not say, lay down and shut up. He did not say if you don't lay down and shut up, I will hit you. He did not threaten her in any way. And in fact, he didn't do anything. It's interesting, I think, and worth considering the fact that for all the things that that she feared that he do that if she didn't, if he didn't have sex with her, that he was going to attack her. He did none of those things. He did nothing of the sort. He never attacked her at all. At the last time when she said, you know, when she pushed him off and not have sex, and she was worried, oh, my God, he's going to start hitting me. What did he do? He didn't pull her back and try to have sex with her. He didn't try to mount her again and have sex with her. He said, can I finish on you? He asked if he could finish. Your time is up. Are there any other questions from the panel? No. No, thank you. Thank you. Thank you. You'll have an opportunity to make rebuttal. Thank you, Judge. Thank you. Mr. Trejo, you may proceed. May it please the court, counsel, Adam Trejo on behalf of the people of the state of Illinois. Defendant raises countless issues, the first one being the sufficiency of the evidence. And that evidence when viewed in the light most favorable to the state showed a disturbing pattern on behalf of the defendants. Here we have the incident with LNES, and both times the defendant suggested, well, told them, let's go to Cooper's Hawk, a restaurant known for its wine tastings. These are the exact same two crimes used to establish propensity, lack of mistake, intent for whatever reason. Took them to the same restaurant, immediately suggested they participate in wine tastings. Afterwards, they went to a table, he ordered the same number of bottles, two bottles per table. Excuse me, I'm going to interrupt you. I know you're on one train of thought. But I had a question concerning, I think, an issue that is very important to me here, and opposing counsel talked about, and I'd like to address it with you. Explain if you can, how is the force that someone uses to a person submit to having sex against their will, the same as the force inherent in the physical act of sexual penetration? It is not, they're two different things. The sexual act and the force necessary to compel somebody to submit themselves into the sexual act are two different things. Is that your question? Yes. So you agree they're two different things. That's not what was leveled by the state, however, isn't that correct? No, the state was reiterating exact testimony. She was, she testified, it was forceful. It was forceful. Let me just bring up the quote. This was all else testimony, she testified that the penetration was rough, hard, fast, and like a good type of rough, hard, or fast, like violent, like force, like very quick. It's not inappropriate to restate the exact testimony exactly from al al. She is telling them. And also it's very important to provide context, because the state's position is that she withdrew consent if there was any. And by emphasizing this, the state was telling the jury she's withdrawing consent because it's hurtful, it's painful, not necessarily collapsing the requirement for force, but providing context for why is she crying uncontrollably during this whole encounter? Why are tears streaming down her face? I think in thinking back to the record and what it reflects regarding what happened at the trial level, while the state did, I mean, I'm asking, didn't they misstate the law when they did refer to the instruction that talked about an element of force refers to actions of the defendant to physically compel a victim to submit, and then also argued that the force of penetration was sufficient to establish the force element of the offense. So they went beyond just taking her testimony that you were just quoting and referring to this. If there was error, it's assuming that that is the case, that I'd like to point out to the state's rebuttal closing argument, where they corrected, where they specifically talked about the force necessary to prove aggravated criminal sexual assault, and in its rebuttal closing argument, the state said, the state said, defendant most definitely had the upper hand, that's a force, he's flipping her manually when referring to one of the acts. So if there was error, if there was any confusion given to the jury, one, the jury instructions corrected that, and also the closing arguments corrected that, especially the state and its rebuttal closing argument when it was referring to the of physical force. Also, in the question that the jury submitted to the judge about perception, kind of indicate that they were aware of the arguments that the state was making regarding perception vis-a-vis reality, and they asked a question that was very cogent, based upon this record, and the trial court didn't clarify, didn't adopt the simple no. How do you reconcile the question that the jury asked with what you've just said? Well, I would like to point out that the state did attempt to provide jury instruction 11.65c, and did want to instruct it, and it was defense counsel who said no, and I'd like to reiterate, he said, this would just give another way to convict my client. So if the state had its wish, 11.65c would have been provided to the jury, and it's the state's contention that that argument has been forfeited because defendant invited that error. All right, Mr. Trejo, you, or not you personally, but the state presented a case, an argument about prior bad acts, and there was prior bad acts evidence, and while I know these things are somewhat sensitive of how much is too much and how little is not enough, there were three witnesses, I think, who were called to testify in the matter of ES, and the first witness in particular was quite graphic. You know, aren't you supposed to, it's supposed to show maybe propensity, or that this, not propensity, but this was not a mistake, this was intentional, this is a pattern, but why can, or how can you justify basically trying the ES case in front of this jury? Well, to your point that it was graphic, well, these are graphic acts that happened, and it's the state's position that it's logical that it presented a limiting evidence of sexual assault with Al Al. With Al Al, she didn't go to a sexual assault nurse examiner. She didn't get examined. There was no one there at her apartment who witnessed it, so the state could not have called these additional witnesses, and with regards to ES, both defended and the state stipulated that there was no DNA with the, there was, the defendant's DNA was not within his body. To overcome that presumption that he wasn't there, the state brought on Honey to show that, no, he was there, and this is the alleged perpetrator for the other crimes evidence, and further, ES did get examined, unlike Al Al, so it's the state's position that it's logical to bring in these witnesses, and I don't believe that the state tried. But the issue isn't logic. Excuse me, counsel. The issue isn't logic. It's whether it was prejudicial, and to have an other crime, so to speak, evidence take more time and be more of a focus than the trial of the victim, how is that not prejudicial, and how is it not error by the trial court? No, it, it is not because, because as the state has stated, these witnesses did not, did not happen, did not happen with, with Al Al. The state couldn't have brought additional witnesses for the Al Al case. She's the only one, and to the point that every, every, every incident is different. Going on to the other crimes evidence, defendant argues that, oh, there are two vastly different, different cases, but these are the exact same case for, for his other argument, stating, oh, well, he penetrated her in the morning as opposed to in the night, but here we have two exact same cases where defendant met both, both Al Al and ES approximately one year before their respective dates. He, he's both expressed, Al Al expressed reservation about being picked up to the point of, of Justice Hutchinson's question. She, at first, Al Al was adamant that she didn't want to get picked up and that she told defendant, I don't want you at my home. But afterwards, defendant keeps telling her another one, another one at Cooper's Hawk, here's another drink, another drink, continue drinking. And of course, unfortunately, Al Al believed that defendant didn't have any and that basically is it. I would say in the mind of the jury that established that Mr. LaMonica is a drinker. It doesn't necessarily establish that he was plying this person with alcohol in order to do something bad. That's, that's one issue, but let's go back to the bad act, which was where we're in the bad act area. If the issue was LaMonica wasn't at ES's apartment, when Honey Daigle brings that dog back after the date, she sees him there. He's there. So that ends up, why do we have to bring her back afterwards and have, you know, ES say, honey, he just raped me. And what was the purpose of that? Well, there were three different purposes and defendant's opening brief didn't really go, go into it. But apparently during cross-examination, defense counsel procured a testimony that when ES was on the balcony, she didn't immediately text Honey that she had, that something had happened. And so when that arose, the state wanted to bring back Honey to rebut that presumption that ES had fabricated the assault afterwards. And the trial court admitted that, that statement under three distinct exceptions, the excited utterance exception, the, and to allow the state to rehabilitate ES reputation or the inference that ES had fabricated that testimony. And of course, under the excited utterance exception and defendant didn't, in his opening brief, didn't really acknowledge that the state was allowed or really contest the trial court's decision to allow the state to come back and bring Honey to test, to overcome that inference that ES was fabricating the fact that she had gone through this experience. That statement wasn't spontaneous, however. I mean, and it certainly wasn't ES's first about the incident either. So why wasn't it error for the trial court to have admitted it? Yeah. The key for that analysis, if this is spontaneous or not, is the ability to fabricate. That's what my research has led me to conclude that it's not necessarily like timing, like you're not necessarily timing. Oh, she waited. And now it's not necessarily, there's no like bright line. Oh, this is the amount of time that you need to state it before it's not like spontaneous. The analysis you're focusing on, did ES have the time to fabricate? And no, she did not. For over an hour defendant, while she was in the balcony, defendant just came out naked. And beforehand, before that she had been penetrated by the defendant and she was telling them, stop, I don't want to have sex with you. He managed to move his position and she managed to get out under there. He comes back and for an hour, she's telling him, I did not want to have sex with you. She's in a heated argument with the defendant. She's not thinking about, oh, how can I make up the story? Oh, what details can I tell somebody? She's in a heat of an argument and it's a safe position that she didn't have time to think. Oh, I'm going to say this to a neighbor. No, she's trying to get this man out of her apartment. So no, she did not have the time to fabricate the statement. She told immediately after defendant left and honey said what happened, which there's case law stating that asking a simple question as what happened does not defeat spontaneity of the statement. I've read briefs. The jury didn't read briefs. The jury didn't know how this was going to happen. But based upon argument here in the last five, seven minutes, we've tried the case of Mr. LaMonica versus ES. We have not tried the case of Mr. LaMonica versus LL or the state versus Mr. LaMonica in reference to LL. And that's the part that is somewhat distressing here. This was not supposed to be a rehearsal for how that next trial was going to go. This was supposed to be essential evidence that would prove that this was not a mistake. This was not just casual consensual sex. And do you see how it went beyond that in any way? Well, again, the emphasis of ES is to show propensity, which is huge, which it was admitted for propensity. This is a huge piece of evidence. So you need to show that these two crimes show general similarity. And I really want to make this argument before my time elapses, because I do want to focus on the evidence that did convict the defendant of aggravated sexual assault, which is the first argument. Here we have an explicit statement from LL saying, stop, you're hurting me. It's the state's position that when LL told the defendant to stop as she's crying, and he didn't, and continue to use his body to remain on LL, that is actual force. And I'd really want to point out people be DeNovo and people be Alexander, which states a person can passively force someone to continue with the sex act by using one's bodily inertia to prevent the partner from disengaging. And that's exactly what happened here. So she disengaged, she pushed him off. And that's after, again, the case law doesn't state whether the victim has the ability to push them off. No. In this case, LL withdrew her consent and made a statement. I want you to get off of stop. It's pretty, it's a pretty unambiguous term. If it wasn't, there'd be more words on a stop sign indicating, please stop your car. No, stop is a pretty definitive, definitive word. Stop what you're doing. And she also gave an explanation because you are hurting me. And he continued to stay on there. And because this pain, because she was experiencing so much pain, she managed to muster enough energy to push him off. But no, but that right there is enough force at per DeNovo and Alexander. That's, that's the force you can passively force someone to continue with the sex act. And that's what happened in this case. So your time is up. Are there any questions by the panel? No, thank you. Thank you. The people of Illinois respectfully requested this honorable court affirm defendants conviction. Thank you. I have maybe one question, maybe two. If I understand your argument correctly, the conviction for rough sex would be sustained based upon your arguments today. Is that correct? Or is there some distinguishing factor between rough sex and what happened here? Based on the arguments and the explanation within the state's brief, that's what the state's rely relies on. And I further on go on and explore in the state's brief, but the state's relying on its brief. Okay. And didn't LL indicate that when she read about the, I thought it was the ES incident that she decided to report the rape that she perceived occurred. Approximately one month, she testified that she read it in the newspaper, that something that happened and that spurred her to go to the authorities. And this was presented to the jury. Yes. Okay. I have no further questions. Thank you. I have not to follow up on that. No. Mr. Spivak, you have the opportunity to make rebuttal. Just, just a few comments. I think one thing that's is worth keeping in mind is, although she complained about that, it hurt consider the fact that when they did the, the sex so-called doggy style, and she said that it hurt. He asked whether she had any lubricant and she didn't have any lubricant. So they decided that she would take his penis and she would lick his penis in order to get it wet and hopefully avoid the problem of the fact that she was dry. In so doing, she's indicating that the consent is still there. There's no evidence that she said, I'm not going to lick your penis or I'm not going to do this. So however, she happened to get to the doggy style sex. She did those things that were indicative and would tell Anthony or anyone else that she was still interested in having sex with even though that it hurt. Council talks a little bit about the drinking, you know, have another one, have another one. I think there was one statement about have another. And I also think that LL testified, she knew what she was drinking. She was 30 years old. There, there is talk about as though, you know, the state withdrew the charge that she was too inebriated or whatever to give consent. They, they, they withdrew that, that allegation. Somehow or other when they left the left the restaurant she's saying that, you know, she's blacking out and you know, she didn't want to get a car in a car with him. Apparently she said, she's scared to get into a car with him. And she, even though she's blacking out and even though why would she be getting whipped? They're on their way. So they could go to a place to fuck basically, but she still claims she's afraid to get into the car with him. She says she's blacking out yet. She managed to drive without getting into any accidents or anything like that. She manages to text someone on the, on the you know, while she's doing it to say that she's going to have sex. So she wasn't like so blacked out that she couldn't do these things. I mentioned, you know, the court's questions. I don't think I need to go in. And again, you know, the fact of the matter is that these were two completely different situations, the situation with ES and the situation with LL. And for that reasons, your honor, we're asking that the convictions be reversed. Any questions from the panel? Yes. How do you, how do you see the opposing counsel's reliance on the two cases he mentioned to establish that there was, I guess I, if I heard him correctly, passive force exerted by your client in that he really didn't get off of her and that she had to use some, I don't know, he didn't use the word superhuman, but superhuman strength to get him off of her. Because he wasn't passively holding her down. To some extent, your honor, I suppose if you're talking just missionary sex, the man is generally on top of the woman. So, you know, to some extent, you know, any kind of sex, there is going to be some sort of inertia apparently there. But the point is that when she wanted him, she was able to, even though supposedly he's much bigger than her, she's able to get him off. And I think it is relevant also the fact that when she gets him off, he doesn't do anything to try to get back on her. You know, that's what shows, you know, if he was bent on having to like sexually assault her, he would have gone and grabbed her again. And defense counsel asked like about four questions about did he ever grab you so hard you couldn't escape his grasp? No. Did he ever threaten to like hit you? No. He never did anything of the sort. So there was no passive trying to hold her down. Thank you. Thank you, your honor. Do you have any questions? No, thank you. Thank you, sir. Thank you. We will take the you may close out the proceeding. Thank you, counsel for argument. Thank you both. Thank you.